Filed 10/20/21  In re A.P.J. CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.P.J. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>S.J.,<br><br>          Defendant and Appellant. | A159694<br><br>(Alameda County<br> Super. Ct. No. OJ1402259801<br>& OJ1502538701) |

In this guardianship appeal, S.J. (mother) challenges the denial of her modification petitions under Welfare and Institutions Code[1] section 388, seeking termination of the guardianships over her two daughters—A.P.J. (born June 2012) and A.J. (born August 2015)—and their return to her custody.  Mother's sole assertion on appeal is that the juvenile court erred by failing to enforce her visitation orders with the minors and unlawfully delegating authority over visitation to the minors' legal guardians.  We affirm.

---

[1] All section references are to the Welfare and Institutions Code unless otherwise specified.  All rule references are to the California Rules of Court.

1

## I. BACKGROUND

### A. *Dependency of A.P.J.*

In March 2014, the Alameda County Social Services Agency (Agency) filed a dependency petition with respect to A.P.J., alleging that the minor came within the provisions of section 300, subdivision (j), after mother was incarcerated for punching A.P.J.'s four-year-old half-brother in the stomach and pushing him to the ground. Mother was alleged to have untreated issues with anger management which put the minors at risk.

At the July 2014 jurisdictional hearing, the juvenile court sustained the subdivision (j) allegation, as well as amended allegations under subdivisions (b) and (g). The (b) allegation stated that mother had failed to seek necessary medical treatment for A.P.J.'s large hernia. Pursuant to subdivision (g), mother had left A.P.J. without any provision for support as she had a warrant out for her arrest and her whereabouts were unknown.[2] In its dispositional report, the Agency stated that A.P.J. was adjusting well to her placement with her maternal great aunt (Alicia J.) and her maternal great grandmother (E.J.). At the September 2014 dispositional hearing, A.P.J. was declared a juvenile court dependent, and reunification services were ordered for mother, who had reappeared.

In advance of the March 2015 six-month review, the social worker indicated that mother's whereabouts were unknown, and, after being discharged from her treatment program for fighting in January 2015, she was not in compliance with her reunification plan. The Agency recommended termination of parental rights. The matter was contested and continued to the 12-month review in May 2015. In the interim, mother had been arrested in March and was in jail. The Agency recommended termination of

---

[2] A.P.J.'s biological father, D.G., is not involved in these proceedings.

2

reunification with a goal of guardianship with the current caregivers, Alicia J. and E.J. At the contested review hearing in June 2015, mother withdrew her contest, reunification services were terminated, and a permanency planning hearing was scheduled for October 2015.

At the permanency planning in October 2015, a permanent plan of guardianship with Alicia J. and E.J. was selected, with mother's agreement. Visitation between A.P.J. and mother was ordered to be supervised for a minimum of two hours once per month. The visitation was further ordered to be "reasonable, with the time, place, and manner to be determined by the legal guardian consistent with the well-being and best interests of the minor." Dependency was continued to stabilize funding and services for the guardians. At review hearings in March and August 2016, the current orders were continued. Mother remained incarcerated. In November 2016, dependency was dismissed via ex parte order.

## B. *Dependency of A.J.*

In August 2015, the Agency filed a dependency petition with respect to newborn A.J., alleging that the minor came within the provisions of section 300, subdivisions (g) and (j), based on the abuse suffered by her half-siblings, mother's failure to reunify with A.P.J., and mother's incarceration at the time of A.J.'s birth on charges of assault with a deadly weapon and child endangerment.[3] The Agency recommended that no reunification services be provided to mother and that a permanency planning hearing be set for the infant minor. At the conclusion of the contested jurisdictional and dispositional hearing in September 2015, the juvenile court found the allegations in the petition true, concluding that A.J. was a minor described by subdivisions (g) and (j) of section 300, and declared her to be a juvenile court

---

[3] A.J.'s alleged father, D.H., is not involved in these proceedings.

dependent. Reunification services were ordered for mother but later terminated after mother was sentenced to five years in prison.

At the permanency planning hearing in July 2016, the court ordered a permanent plan of guardianship with Alicia J. and letters of guardianship were issued. The court ordered reasonable, supervised visitation between mother and A.J., with the "time, place, and manner to be arranged by the legal guardian, consistent with the well-being and best interests of the child." Minimum visitation was set at once per month for one hour. Dependency jurisdiction was dismissed.

## C.     *Mother's Section 388 Motion*

On August 13, 2019, mother filed modification petitions under section 388, asking that the guardianships for A.P.J. and A.J. be terminated, the minors be returned to her custody, and family maintenance services be provided as the "court sees fit." Mother was released from prison in July 2018. According to her petitions, she had since completed her case plan requirements, obtained stable housing, and was active in her recovery.

At the hearing in September 2019, the matter was continued for further investigation. In advance of the October 2019 continued hearing, the Agency filed a report recommending that the modification petitions be denied. According to mother, after her release from prison, she would go to Sacramento to visit A.P.J. and A.J. daily. However, in October 2018 there was a disagreement between mother and Alicia J., and the guardian cut off all contact. Mother and her four-month-old baby were living in Oakland with the maternal grandmother, for whom mother worked providing in-home care. Mother reported a series of concerns regarding the minors' placement with the guardians.

4

According to Alicia J., the plan had been for mother to move to Sacramento when she got out of prison so she could get to know the children. She stated that mother was very disrespectful, cussed out the guardian in front of the minors in October 2018, and was not stable enough to care for the children. She wanted the minors to have a relationship with mother and hoped mother would "stop the drama." The guardian expressed confusion as to why the social worker was again involved and did not cooperate with the social worker's requests to meet with the children. When the social worker met with A.P.J. and A.J. in the guardian's presence, there were concerns the children had been coached. The social worker noted that, if dependency jurisdiction was reinstated, it would jeopardize the guardians' funding.

At the October 2019 hearing, the court ordered the guardian to facilitate visitation supervised by a neutral third party between mother and the minors. The guardian was also ordered to provide the social worker and minors' counsel access to the children. The juvenile court concluded that more information was necessary to find the best solution for the family and continued the matter to November 2019 for further investigation. The court clarified that it was not reinstating dependency.

Although Alicia J. initially remained uncooperative, she apologized to the Agency and allowed access to the children. Weekly supervised visitation was arranged for mother with the children at the public library. The social worker visited the mother's apartment and found it appropriate. In addition to caring for her newborn, mother's oldest child visited on weekends. The first visit with A.P.J. and A.J. went very well. However, E.J. expressed concern visitation would " 'mess with [the minors'] heads,' " and the second visit was cancelled by the guardians due to a family funeral. The social worker recommended that the matter be continued for further assessment.

5

At the November 2019 hearing, the court ordered twice weekly supervised visitation. All parties were ordered not to discuss the case with the children or make disparaging comments to them regarding other parties. The court found that mother had made a prima facie showing under section 388 and continued the matter to December 2019 for hearing.

In its next update, the Agency reported that mother and Alicia J. were communicating more openly with each other, and the guardian was allowing phone conversations between mother and the minors. Both the guardian and mother were frustrated that overnight visitation was not authorized for Thanksgiving because it would be easier for mother, and they were now "willing to work things out regarding a visitation plan." The social worker later learned that mother visited with the minors in the guardians' home on Thanksgiving and was allowed by the guardian to be with the children overnight at the home of a nearby relative. Thereafter, when the social worker offered mother three possible visitation dates for the first week in December, mother stated both she and her baby were sick. She expressed frustration that the children were not transported to her in Oakland, and the social worker explained that the Agency generally facilitates travel by the parents in these situations so that the minors can maintain a normal schedule.

Mother initially agreed to two of three visitation dates for the next week, but then told the social worker she would no longer communicate with her without her attorney present, would not engage in any more visits, and would not come to the next court hearing. The guardian told the social worker she was still supportive of mother visiting the children and that mother could come and see them any time. The Agency noted that the children had been with the guardian for four years and returning them to

mother would require clear evidence that the change was in their best interests. It recommended that the modification petitions be denied and that a visitation plan be set up for the mother and children. At the December 2019 hearing, the Agency requested a continuance because the social worker was ill and not available to testify. The matter was continued to January 10, 2020, with four specific overnight visits set for mother and the minors in the interim.

According to the social worker, the mother and the guardian were able to keep to the proposed visitation schedule, and the guardian was supportive of the minors having visits with their mother. However, mother kept the children an extra night on one visit, citing travel issues; on another visit there were issues with the father of mother's most recent child yelling at the children not to call the guardian mom; and A.P.J. reported to the social worker an altercation with mother at a visit during which A.P.J. wanted to go home and mother told her, " 'This *is* your home.' " At the January 10 hearing in which mother testified, the court moved the visitation back to the library in Sacramento and continued the matter to January 16. On that date, mother's attorney apologized on mother's behalf for an outburst mother had at the January 10 hearing. Mother was very upset, but she understood it was inappropriate and that she needed to maintain her emotional composure going forward, and she intended to do so. Mother then testified further, and the hearing was continued to February 6, 2020.

The juvenile court conducted the section 388 hearing over three days in early 2020. Mother testified regarding her engagement in services, her contact with and concerns regarding the guardians, her visitation and relationship with her daughters, and her plans should she reunify with them. With respect to anger management, mother had completed three programs

while incarcerated and one outpatient program after her release. The programs ranged from one to six months in duration. She admitted that the court process was very challenging for her and was testing what she had learned. Mother also testified that, if the children were returned to her, she would maintain a relationship with the guardians.

The social worker testified that mother was appropriate during the one visit she supervised and that the visit was a very positive experience for the children. However, mother was resistant to traveling for visits and it was concerning she did not see the need for a child-friendly transition. The social worker was sitting in the back of the courtroom during the January 10 hearing when mother became upset and could hear mother screaming outside the courtroom, slamming doors, and stating she was upset with the court process and would no longer be participating in it or in visits. Mother later called the social worker and apologized for her behavior. The Agency recommended that the section 388 petitions be denied because neither mother nor the guardians were helping make a positive transition and mother's failure to visit as planned left the Agency without sufficient information to recommend return of the minors.

Mother's attorney argued that there was ample evidence of mother's substantial changed circumstances since the prior dependency proceedings. She further argued that allowing A.P.J. and A.J. to rejoin mother and their half siblings as a family while having continuing contact with the guardians would be in their best interests. Counsel for the Agency conceded that mother had shown changed circumstances, but argued that it could not recommend return to mother at that point, given that both mother and the guardian had failed to create a child-friendly process and there was insufficient information as to how mother would handle up to four children at

8

once, especially given A.P.J.'s special needs. Under such circumstances, the minors' needs for continuity and stability would best be served by remaining with the guardians. Minors' counsel agreed with the Agency. While she would not "[close] the door" regarding return of her clients to mother, she felt it would be premature at that point. Mother's attorney responded that returning the children under a family maintenance plan would allow for the provision of services to aid in the transition.

The juvenile court denied mother's modification requests on February 6, 2020. While the court acknowledged that mother had demonstrated changed circumstances, it did not find those changes to be substantial or permanent. In particular, the court referenced mother's outburst at court, evidence which gave the court "pause as to . . . what would happen when adults weren't in the room if that's what happened in a court of law." The court noted how frustrating young children can be. The court was also concerned about mother's insistence that visits happen in Oakland, even though it was "abundantly clear" this was not good for the children. It questioned whether mother understood any transition needed to be "kid-first" and "kid-friendly." And the court found mother's assertion that she would keep the minors involved with the guardians not credible. On this basis, the juvenile court concluded that changing the status quo would not be in the best interests of the children—who had been with the guardians for the majority of their lives—and their need for permanence and stability. After denying the petitions, the court stated that "[a]ll current orders remain in full force and effect." This timely appeal followed.

## II. DISCUSSION

### A. *Legal Framework*

"At a permanency planning hearing following a parent's failure to reunify with a child, the juvenile court may appoint a legal guardian for a minor and issue letters of guardianship." (*B.B. v. Superior Court* (2016) 6 Cal.App.5th 563, 569 (*B.B.*); see also § 366.26, subd. (b)(3).) Any minor for whom a guardianship has been established at a permanency planning hearing under section 366.26 "is within the jurisdiction of the juvenile court." (§ 366.4, subd. (a).) The court may either "continue dependency jurisdiction if it is in the child's best interest or, as it did here, terminate dependency jurisdiction and maintain jurisdiction solely over the guardianship." (*B.B.*, at p. 569; see also §§ 366.3, subd. (a)(3) & 366.4; rule 5.740(a)(3).)

"Once legal guardianship is established, it may be modified pursuant to section 388." (*B.B.*, *supra*, 6 Cal.App.5th at p. 569; see also *In re N.B.* (2021) 67 Cal.App.5th 1139, 1146.) Under section 388, an interested party may petition the juvenile court to change or set aside a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).) The court must hold a hearing on the petition if "it appears that the best interests of the child . . . may be promoted" by the change in order. (§ 388, subd. (d).) "Thus, the [petitioner] must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests." (*In re G.B* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*).)

Moreover, "[o]nce reunification services are terminated . . . the focus of the proceedings changes from family reunification to the child's interest in permanence and stability." (*G.B.*, *supra*, 277 Cal.App.4th at p. 1163.) This "focus on the child's best interests remains in place whether or not a parent seeks additional services under section 388." (*Ibid.*, italics omitted; see *In re*

*Edward H.* (1996) 43 Cal.App.4th 584, 594.) Thus, at the post-reunification stage, "a parent's petition for . . . an order . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

We review the denial of a section 388 petition for an abuse of discretion. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.) Thus, the denial must be upheld unless we can determine from the record that the juvenile court's decisions exceeded the bounds of reason. And, when two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522.) A court abuses its discretion, however, when it applies incorrect legal standards. (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289.)

## B.     *No Error in Juvenile Court's Denial of Section 388 Requests*

Mother makes no argument here that the juvenile court abused its discretion by denying her section 388 petitions requesting termination of the guardianships and return of her two daughters to her care. Indeed, it would be difficult to argue on this record that the juvenile court's decision to maintain the guardianships exceeded the bounds of reason for the reasons articulated by the court. Instead, mother claims the court erred by abdicating its authority to enforce the prior visitation orders in the case and by improperly delegating its authority over future visitation to the guardians.

We disagree, seeing no evidence that the juvenile court misunderstood or misapplied the law in making its ruling.

Pursuant to section 366.26, subdivision (c)(4)(C), a court ordering legal guardianship for a child is required to order visitation with the child's parents, unless the court finds that visitation would be detrimental to the child. It is well settled that "[t]he time, place, and manner of visitation may be left to the legal guardian, but leaving the frequency and duration of visits within the legal guardian's discretion allows the guardian to decide whether visitation actually will occur," and is therefore improper. (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314; *In re M.R.* (2005) 132 Cal.App.4th 269, 274.) The visitation orders that were imposed when the guardianships were initially established pass muster under this standard. While the time, place, and manner of the visitation was left to the guardians, visitation was ordered to be reasonable and at least once a month—a minimum of two hours for A.P.J. and one hour for A.J.

When mother filed her section 388 petitions, and it became apparent that there was a breakdown in cooperation between mother and the legal guardian with respect to visitation, the juvenile court made a number of specific visitation orders to arrange sufficient interaction with mother so that the court could determine whether mother's request for termination of the guardianships and custody of the minors should be granted. Given the juvenile court's efforts to facilitate visitation, we find no merit to mother's contention that the court abdicated its responsibility to enforce prior visitation orders.

Mother's assertion that the juvenile court failed to enter a valid visitation order for prospective visitation is equally without merit. When the juvenile court denied mother's section 388 petitions, it held that "[a]ll current

12

orders remain in full force and effect." At this point in the proceedings, dependency jurisdiction had not been reinstated and no party had requested a modification to the standing visitation orders. Thus, the standing orders remain in effect and control visitation under the guardianships unless a new modification request is made.

In denying mother's modification petitions, the juvenile court noted that the guardians and mother were going to "be involved in each other's lives" and entreated them to find a way to de-escalate conflict for the benefit of A.P.J. and A.J. We join in the juvenile court's hope that mother and the guardians find a way to work together in the best interests of these young girls.

### III. DISPOSITION

The judgment is affirmed.

_____

                    SANCHEZ, J.


We concur.


_____

HUMES,  P.J.


_____

BANKE, J.


(A159694)